You may be seated. Good afternoon. This is case number 4-12-0723. In re Marriage of Saxer, for the appellant is Attorney Stuart Schiffman and for the appellee, Attorney David Liefers. Mr. Schiffman, are you ready to proceed? Justice Polk, may it please the court, counsel. I appear this afternoon on behalf of William Saxer. William and Judith Saxer were divorced in Morgan County in December of 2011 after a one-day trial before Judge Charles Gramlich. Judge Gramlich heard the evidence, arguments were submitted, he ruled in December of 2011 and shortly thereafter retired. A post-trial motion was filed before Judge Jeffrey Tobin who was assigned the case after Judge Gramlich's retirement. Judge Tobin ruled on post-trial motions and subsequent to his ruling, this case is now before the court, this court, on two very, I think, two large issues which I hope to address this afternoon. The court's ruling with respect to the pensions of the parties and the trial court's determination with respect to the classification of pieces of farmland as marital property. I would like to address the pension issues first and I think begin this discussion with I think an important point that needs to be made before the court and that is the different pensions that we are dealing with here. Mr. Saxer has a defined benefit pension that he has received from his employer, the Illinois Agriculture Association. At the time he began receiving his pension, which he is in fact receiving and which at the time of trial was in payment status, he was receiving roughly $3,200 a month. It's interesting to note, and I will speak to this point in just a bit, but his monthly pension payment of $3,200 a month was determined by the fact that he elected to provide Judith Saxer with a surviving spouse benefit, which was recognized by Thomas Langford who evaluated these pensions. Mr. Saxer's pension, if it is to be divided by a court, is provided pursuant to statute by the creation of a quadro, a qualified domestic relations order, which essentially separates portions of that pension into a pension for Mr. Saxer and a pension for Mrs. Saxer, a benefit I should say. Mrs. Saxer was employed by the state of Illinois. At the time of the divorce, at the time of the court's ruling in December, she was still working. She was not receiving her pension. Any amount of pension that is divided by the court is divided by a document that was created by the legislature. A quidro, a qualified Illinois domestic relations order. A quidro is not the same as a quadro. Indeed, some have likened a quidro to essentially a garnishment where a portion of money is just simply sent to the other party, but it doesn't have the same effects as a qualified domestic relations order. The problem with this case, at least with respect to these pensions, is the fact that Judge Tobin essentially said it was Judge Gramlich's belief that the pension should be distributed equally. Now, that didn't take into account the fact that Mr. Saxer had worked for a portion of time before the marriage, at least had certain pension benefits that had accrued before the marriage. It didn't take into account the fact that when Judge Tobin made that ruling, Mr. Saxer was already receiving his pension. Mrs. Saxer was not receiving her pension. Indeed, Mrs. Saxer could, in theory, reduce Mr. Saxer's receipt of monies from her pension by continuing to work. She may still be working today. I do not know that, but at the time of the divorce, she was working. She was not receiving her pension benefits. At the time of the divorce, Mr. Saxer, his pension was in payment status, and he had been, in fact, receiving his pension for a substantial period of time. More important, however, is the fact that Judge Gramlich, in his December ruling, simply failed and refused to consider a substantial piece of the pension puzzle, or the pension pie. And that was Mrs. Saxer's surviving spouse benefit that was valued by Mr. Lankford at over $100,000. Now, in this case… Excuse me. And if she weren't receiving it, will he receive it? Let's say that she dies. That didn't happen. But let's say that he was receiving his pension benefit, and somehow she had passed away and could not receive the survivor benefit. Would his benefits increase? Justice Holder-White, I don't know the answer to that question. I know that in other defined benefit plans, for example, the Illinois judicial pension, that there is a separate surviving spouse determination. And if the spouse dies first, there is some consideration for that fact. And there was actually a return of the money that was invested by the judicial spouse, I would call it. But in this case, I don't know the answer to that question. But let me respectfully suggest to you that it makes no difference. Because the problem here is the fact that Judge Gramlich, in his ruling, essentially said, Well, I'm very suspect about these surviving spouse awards, because life is unpredictable. Which, while that is true, that life is unpredictable, the bottom line here is that Mr. Saxer created a surviving spouse award for Mrs. Saxer. And do we know what amount that reduced his benefit, if any? It reduced his benefit. We do not know the specific amount, but it did reduce his benefit. I believe it was roughly, well, I won't say. It did reduce his benefit, and there was testimony, I believe, in the record that it did reduce his benefit, although the exact amount was not necessarily, it may have been stated, but I do not recall it at this point in time. I believe in the Lankford Report, there is some mention of that fact. Now, in this case, the court, Judge Gramlich, did make a determination, did make a statement, that given the length of the marriage of the parties, and there were substantial assets, that it was his goal to effectuate, and I believe Judge Tobin followed this, to effectuate as nearly as possible a 50-50 split. But the bottom line here is this. When you take a $109,000 asset and say, I'm not going to consider it, I'm going to reduce it to zero, it becomes difficult to make that 50-50 split. Now, case law on this point is clear. Marriage of Sewicki, which is a third district case, made it very clear, and that case dealt with a workers' compensation disability benefit. But the language of the case, which I know the court has read, is very clear. A surviving spouse award is a distinct piece of marital property, which must be calculated in the marital property portion of the estate, and it must be determined. It must be considered. In this case, Judge Gramlich decided he would not consider it, and it is not correct to say, by the way, well, Judge Gramlich considered it because he mentioned it in the December order. He mentioned it only in the December order to disparage it and to say, I don't think it's something I need to calculate. I'm suspicious, and these surviving spouse awards are a suspect because of the fact that one never knows who will survive. The counsel, is it the same to say that you're not considering it when you say that you're suspect of it? Well, the difference is, of course, that he considered it only to disparage it. He considered it to reduce it to zero. Justice Holder-White, I'm reminded of the story of the two brothers who fought throughout their entire life. And when the first brother died and they read his will, at the time of reading his will, the will said, To my brother Joe, who always thought I would never mention him in my will, I would never mention him in my will. Hello, Joe. The fact that he's mentioned doesn't mean that he gets anything. The fact that Judge Gramlich mentioned it here really is just, and his language was very clear. The court has always been suspect of pension valuations because of the unpredictability of life expectancies involved. Then he went ahead to say the pensions can be divided by qualified orders, which is really not true. And if you divide it by a qualified order, and you don't include the fact that there was a $109,000 surviving spouse award, you're not dividing it fairly. Let me give you another example. I know it's very hard to draw analogies, but the parties had a home in Morgan County. The value of the home was slightly in excess of $100,000. Had Judge Gramlich, in his opinion, in his decision, said, These are very difficult times for real estate, and real estate values are very speculative. They go up and down quite a bit. This was in 2011. I'm suspect of a real estate evaluation that says a piece of property is worth $100,000. I'm going to give her the house, but I'm not going to value it at $100,000. Again, you are essentially doing something there that is inappropriate under the statute. You're taking a piece of property, a piece of marital property, a piece of the marital estate. That's what Sawicki says. It's marital property. It has a value. Did you find, Mr. Shipman, any cases in your research involving a defined benefit plan where this argument was made and discussed by the trial court in a dissolution case? Only Sawicki. I mean, there are many cases. There are no specific cases in answer to your question, but there are specific cases that talk about the failure to value a piece of marital property, and I think that in this case, this is a piece of property that needed to be valued, or at least not treated as if it didn't exist. Well, counsel, let me ask you this question. I know that you've indicated you believe the judge intended to do a 50-50 split. Isn't it possible that the judge felt that a 50-50 split otherwise, other than the pension, was equitable? Isn't that possible? I'm not sure I understand the question. There was a marital estate, and the judge said, it's my intent to divide that marital estate 50-50, as equally as possible. Then the pension, the pensions are separate. There would be the quadro and the quildro, if necessary. The pension benefits are separate, and all that was said was, we're going to divide those equally as well. But part of the problem is, you really can't divide them equally, given where they were at the point. Now, if in fact it was the judge's intention to divide them equally, under the circumstances and the factual circumstances of the case, that could not be accomplished until such time as both parties, at a minimum, were in an equal payment, an equal status with respect to their pension. Because, if a pension is divided if, as, and when received, and one party can deny the other party the opportunity to receive that pension by continuing to work. Isn't that true in every case we see, though? Only in a case where the pensions are, where that provision is made. Now, the answer is yes, that if you have that type of a pension, for example, a state of Illinois pension, if a judge says, I want to divide the pensions equally, but one party is receiving their pension, and the other party has yet to receive their pension, then you don't really have an if, as, and when received situation. So, in this circumstance, if in fact the court's goal was to accomplish the 50-50 split, the court didn't accomplish that fact in light of two things. Well, actually three things. The unequal status of the two pensions, the unequal receipt of the two pensions, one receiving his pension and one not yet receiving her pension, and finally, the complete failure to include an asset in the pension calculations, valued at over $100,000. How would you do the calculation, Mr. Shipman? If we accepted your position, how would the court calculate that? Well, we did argue to the trial judge that if you calculated, if you included the $109,000, the surviving spouse award for Mrs. Saxor, that we thought an equal distribution using Mr. Langford's figures, the $109,000 for Mrs. Saxor, the surviving spouse benefit, the valuation of her state of Illinois pension, which I believe was in the range of $240,000 or $250,000, those two numbers came to about $370,000. Mr. Saxor's pension at that time, at the time in December of 2011, was $3,200 a month. It was in payment status. $3,200 a month times his life expectancy, which I believe was 10 or 11 or 12 years. It came out to roughly the same figure. So it was our suggestion to Judge Gramlich that at that point, using those figures and applying that to this situation, that essentially the pension's washed. He gets his pension, she gets her pension, and the surviving spouse benefit. And you don't have to have a quadro, you don't have to have a quildro. I assume that if her pension is in payment status now, and even if the judge said, we're going to issue a quadro and a quildro, no trial court would say, well, she gets 50% of his pension, he gets 50% of her pension. That would be creating a difficulty. The two numbers could be offset, I would assume. But I think that my suggestion that there be just the one, that the parties each receive what they had, would have been an appropriate way to deal with it. In your brief, you suggest that there were two approaches that the trial court should have considered. One was the immediate offset approach, and the other the reserve jurisdiction approach. The one that you're suggesting here today, in terms of each party just take what he or she has, how does that play into the two that you had suggested in your brief? Because a court can always say, to me, the immediate offset approach includes the fact that a court can say, all right, you're receiving a pension of $3,000 a month, I'm going to award the other side sufficient marital property to compensate for that, and then there will be no pension payments made to the other side. I guess one of the problems, or not problems, but one of the difficulties in a case like this is, divorces more often occur before the parties receive their pensions at a younger age. And under those circumstances, a court says, well, the husband's pension presently has a net value of, let's say, $100,000. The wife has no pension at the present time, so I'm going to award the wife $100,000 worth of property to offset what the husband's pension value is. Or the wife has a pension value of $50,000, I will award her something else. That, to me, is part of the offset theory. I'd like to get to, since I've got the first slide on, I'd like to move on to the second issue, which is the court's determination that the 123 acres of farmland was marital property. And our inquiry here, I think, should begin very simply with what the statute provides. The statute provides that all property acquired during the course of the marriage is presumed to be marital property, unless… I'm very sorry. Okay, I get to stop right in the middle of a sentence. You can finish your sentence if you want to. Unless the property is one of the statutory exceptions. And in this case, there was not a period there, there was an end. And in this case, the statutory exception of inherited property was established by the evidence and, in fact, was found by Judge Gramlich to be what the evidence established. Thank you, Mr. Shiffman. You'll have a chance on rebuttal, too. Mr. Liefers? Thank you. May it please the court, Mr. Shiffman. Let me start where he left off, if I may. Bill Saxler had inherited, if you will, using the term loosely, an undivided one-half interest in the 123 acres of farmland. His mother had created a life estate. Bill received an undivided one-half interest upon her death, and his brother received an undivided one-half interest. His brother began a partition suit. Bill then purchased, during the marriage, purchased his brother's interest in that real estate. It wasn't anything inherited. It was something that was purchased. At trial, and Your Honors, one of the things that sort of amazed me then and still amazes me is the fact that this case, as Judge Gramlich pointed out, it took five years to bring this to trial. And, you know, reviewing the records, you can see multiple discovery requests and probable exchanges of information. But at trial, Bill, I would assume, realizing that since he purchased that farmland, and there was a presumption that it was marital property, that then he would have the burden of overcoming that presumption by clearing convincing evidence. And you would think, and this applies to the Warren Boynton account as well, you would think then that if he's claiming that he received dollars from mother's estate or father's estate or Aunt Susie's estate, it doesn't matter, that there would have been documentary evidence offered that Bill received X number of dollars from one estate, that he did ABC with this money, he put it in a certain account, he didn't commingle it, and essentially that he used that account for specific purposes. But in other words, he had plenty of opportunity to support his naked assertion that the money that was used to pay off the debt against the 123 acres was a non-marital source. He didn't. And Judge Gramlich, who was in the position to determine his credibility and to determine the weight to be given to his testimony, was amazed that there wasn't anything offered in support of this. Accordingly, obviously, he found that Bill didn't overcome the presumption of marital property and hadn't proven that the one half interest that he purchased was in some form or another non-marital property or purchased with non-marital property, for which he was entitled to a reimbursement. The same thing applies to the Warren Boynton account, which is the third point that they make in their argument. Not one scintilla of document to support this. Now, Your Honor, and Mr. Shippen didn't address, but let me talk about the attorney's fees. Judge Gramlich correctly corrected me in my final argument when I argued probably the old theory that the money that Bill had paid to the Rammelkamp-Bradley firm and to the Feldman firm of about $153,000 was a dissipation. He ruled that it was an advance from the marital estate. He refused, however, to essentially award Bill the $153,000 he paid out and Judy the $27,000. He just simply reduced the marital estate by that amount of money and simply divided up what was left. Judge Tobin, in a position as then the sitting trial judge, to correct that ruled that that was essentially that Bill's share or the $153,000 was an advance from the marital estate, should be included in this column, and Judy paid some difference because of that. Just like the $27,000 was in her column. So, Your Honor, with regard to particularly the latter three issues raised by the appellant in this particular case, I see absolutely no reason whatsoever to reverse Judge Gramlich and Judge Tobin in the determinations made. Certainly with regard to the marital property, the 123 acres of farmland and the Warren Boynton account, it's certainly not manifestly erroneous. And with regard to what Judge Tobin decided to do with the advances of a substantial amount of money as attorney's fees, that certainly isn't the use of discretion. Let me turn to what I consider to be a little more difficult issue and that relates to the retirement benefits of the parties. Mr. Schiffman correctly points out that Judge Gramlich said that, and I paraphrase Judge Gramlich, and I won't use whatever tone he may have used at the time, but basically what he said was that he's always been suspect of pension evaluations because of the uncertainties associated with life expectancy. And he said that to apply equally to Judy's pension, apply equally to Bill's pension, apply equally to the surviving spouse portion of Bill's pension. And then what he was charged with was the responsibility of, under the facts of the case, is to make a fair and equitable distribution. For the appellant to say that Judge Gramlich wasn't cognizant of the fact that there was a surviving spouse benefit, you know, basically belies the record. He was, but what he decided to do was not accept the evaluation of Dr. Langford because of his suspicions or suspect with regard to those pension evaluations and simply, in what he considered to be a fair and equitable manner, divide the retirement benefits. Judy was to get 50% of the marital portion of Bill's pension, defined benefit pension. Bill was to get 50% of Judy's state of Illinois pension. Judy was to get the benefit of the annuity, the surviving spouse annuity, assuming she outlived Bill. And Judge Gramlich believed, within his discretion, that under the facts of the case, that was an equitable and appropriate division. Mr. Liefers, was all of Bill's pension earned during the marriage? Wasn't there a portion that was earned prior to the marriage? Yes, ma'am. And actually, it's sort of interesting, this record here. Judge Gramlich rejected Dr. Langford's conclusions with regard to values because he was suspect of life expectancy tables. But yet, in the record, it clearly reflects that 87.8% of his total monthly benefit was accrued during the marriage, and the remaining roughly 12% was non-marital. And as I pointed out in my brief, that can be taken care of. I mean, we use the Hunt-type formula all the time to exclude the non-marital portion of it. So that can be taken care of. So there was an error in the calculation of the pension, even due in the quadro and quadro of Bill's pension? I don't know, Your Honor, if there was so much an error in the calculation as the fact that Judge Gramlich determined not to accept Dr. Langford's conclusions with regard to values. But yet, in the record, there still exists, obviously, Langford's reference to the number of months that Bill had worked before the marriage versus the total number of months. So there is a manner in which we can do that. And I think it's relatively simple. We do it all the time. So you believe both parties would accept that calculation as far as how long he worked for the company prior to the marriage and earned retirement benefits that Langford came up with? You don't think there's any dispute as to that? Well, Your Honor, at this level of a proceeding, I never am presumptive enough to assume that counsel or the other party will agree with that calculation. But it's a calculation that we always make. I mean, it's relatively routine. So Mr. Shipman talks about the fact that Judy's pension wasn't in pay status at the time and how that harms Bill. Well, if you think about it, the other side of that coin, it harms Judy, too. She's not receiving her pension if she continues to work. And so, therefore, they're both equally harmed. She doesn't receive any benefit from not receiving her pension. So, Your Honors, basically, oh, the Seklicky case that Mr. Shipman referred to, if I remember the facts of that, where the trial court made a mistake and the reason it was reversed and remanded on the pension point was that the evidence was obvious that the pensioner had earned part of the credits prior to the marriage. And the way it was handled at the trial court level, that ignored his non-marital property aspect of that particular pension, if I remember that correctly. And we're not suggesting that at all. We're suggesting that it's a relatively minor problem that can be handled in a manner in which we typically handle it with reference to the appropriate order. So, Your Honors, basically what I think and what I'm saying is that it was up to Judge Bramley, within his sound discretion, to determine what's fair, just, and equitable. He was cognizant of Bill's pension. He was cognizant of Judy's pension. He was cognizant that there was a surviving spouse award, or attributable annuity, if you will, that's attributable to Bill's retirement plan. And he decided in his discretion that this approach, using these orders, would be fair and equitable. And that's well within his discretion. Excuse me, first, before you get on to something else, I wanted to ask you, you just mentioned again, it could be corrected. Are you referring to the same issue we've talked about before, with the non-marital portion? Yes. Yes, that's specifically what I'm addressing. The court has asked Mr. Shiflin a couple of different questions relative to Bill's pension. First of all, they are only assuming, and we don't know as a factual matter in the record, that Bill's monthly benefit was reduced by the surviving spouse annuity. Now, sort of common sense tells me somebody paid for it someplace, but there's no evidence in the record to support that. There's really no evidence in the record to support Dr. Lankford's assumption, that's the word he uses, just like he assumes that the state of Illinois pension is going to be in good health, that type of thing. But there's nothing to support his assumption that the surviving spouse annuity is the equivalent of two-thirds of the pensioner's annuity. There is nothing in his record, in the record that reflects whether or not if Judy would pre-decease Bill, given the uncertainty of life. There's nothing in the record that would suggest that Bill can't buy, I mean we don't know one way or the other, in response to your question, Your Honor. We don't know whether or not he can recoup that difference, if she should pre-decease him. Nonetheless, Your Honor, the question is, we've got the record before this Court, and the question is, did Judge Gramlich abuse his discretion? And I would respectfully request that the Court sustain his decision on all four points that are raised on appeal. If, for some reason, and I want to make this point, if for some reason, Your Honors, you decide that there has to be a remand to address a pension-related issue, then I am asking that the Court, if there is a remand, specifically direct that it only relates to, only relates to, the issue of a fair division of the pension. Basically, the reason this concerns me is that when we were doing our post-trial motions in front of Judge Tolan, basically, and I quoted the famous philosopher Billy Crystal, who said, you know, use that expression, it's a do-over. And I got more than a distinct impression from Mr. Shiffman during our post-trial arguments that they wanted a do-over. They wanted to address all of the issues, including the issues that they raised in points two, three, and four of their argument. The Court was in a position to classify the property, was in a position to give whatever weight the evidence was entitled to, and the Court made its decision. And certainly, setting the pension aside just for a second, assuming there would be a remand, I would encourage that it be strictly limited to the issue of the retirement benefits. And if there's no other questions, unlike many of my brethren, I'm done. Thank you, Mr. Liefers. I don't see any other questions. Mr. Shiffman, rebuttal? Thank you, Judge. Judges speak through their orders. While we have heard a lot of things about what Judge Gramlich thought and what Judge Gramlich assumed or what Judge Gramlich presumed in this case, he spoke through his order. His order said the Court has always been suspect of these pension evaluations. Dr. Lankford's report was the only evidence on these issues. It was submitted by the parties by stipulation. To say, well, there's nothing there, we don't take any of it, means that there was no evidence at all on that point. Mr. Liefers has suggested what Sawicki meant. While I don't like to read to the Court, and I know the Court has read the case, I have to point out what Sawicki said. A survivor's benefit is a distinct property interest, quoting Smithburg v. Illinois Municipal Retirement Fund, 192 Illinois 2, 291. Even though it is of a contingent nature, a survivor's benefit has a determinable value, and it is properly considered a marital asset. Now, with all due respect... Counsel, in Sawicki, was there even a reference to the wife's interest in the survivor annuity? Yes. It was a worker's compensation disability benefit. No, no, I mean by the Court in making its decision. Yes. Whether or not Todd chose to elect the survivor annuity during the marriage is irrelevant to the allocation of the cost of the annuity in the judgment of the solution. I think there was a reference to it. I think the Court made it very clear. Were you reading from the opinion? I'm reading from Sawicki's opinion. Right. Maybe you're not understanding my question. At the trial court level, did the trial court make any reference to that annuity? The trial court made reference to the annuity in the same way Judge Gramlich made reference to it, by not considering it as a piece of marital property. I mean, I don't know what the trial court did. I know what the record says, and the record says this surviving spouse benefit is valued at zero. That's why the appellate court had the issue. That's why the appellate court had to deal with it. With respect to the marital property and the farmland, I would like to call this Court's attention to the case I've cited in my brief, the Berberet decision, which is a Fourth District case. Berberet is a very similar case, I believe factually, to the facts of this case. In Berberet, the issue was certificates of deposit that actually were funneled, I guess the word is, funneled through the marital account of the parties. And this Court essentially, I believe, said that now they didn't really change their classification, they didn't really change their status by that action. And I also want to, while we've talked about this factual determination, Judge Gramlich and Mr. Liefers both relied very much on Didier, which is a First District case. Didier was a gift case, where the mental state, the donative intent was a big issue here. This property never changed classification. This property was inherited by Mr. Saxby. And the fact that his brother instituted a partition lawsuit is of no legal significance to the fact that the property was inherited. This land was inherited, it remained inherited throughout the parties' lives, the marital lives. They treated it as non-marital property. They had separate accounts. And somehow to suggest that because Mr. Saxor testified to it but didn't bring in a lot of paperwork, somehow disparages that testimony and makes it of less value, I think is a dangerous argument to make because essentially what will happen is that the trial courts will be inundated with every check and every financial statement. Mr. Saxor said he inherited it. Mr. Saxor testified how it was treated. Read Mr. Saxor's testimony. And I believe that Judge Gramlich's determination that this property was somehow changed into marital property was an abuse of discretion and was against the evidence that Judge Gramlich himself found in his written work. Thank you. Thank you, Mr. Shipman. We'll take this matter under advisement and be in recess for a brief moment and we'll be back for the three of you.